COURT OF APPEALS
DECISION
DATED AND FILED

December 23, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.     2020AP1183-FT**

**STATE OF WISCONSIN**

Cir. Ct. No. 2015ME25

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF J.M.K.:

CALUMET COUNTY,

　　PETITIONER-RESPONDENT,

　V.

J.M.K.,

　　RESPONDENT-APPELLANT.

　　　　　　APPEAL from an order of the circuit court for Calumet County: JEFFREY S. FROEHLICH, Judge. *Affirmed*.

¶1    DAVIS, J.[1] "Jane"[2] appeals from an order extending her involuntary commitment under WIS. STAT. ch. 51.  Jane concedes that she is a proper subject for recommitment and challenges only the accompanying order for involuntary medication and treatment.  Specifically, Jane argues that Calumet County (the County) did not prove that she was incompetent to refuse psychotropic medication, pursuant to WIS. STAT. § 51.61(1)(g)4.  We disagree and conclude that the County met its burden.  Accordingly, we affirm.

## BACKGROUND

¶2    Jane has been subject to continuous orders for involuntary commitment and involuntary medication and treatment since 2015.  In August 2019, the County petitioned for an extension of her most recent commitment order.  A hearing was held in October 2019, at which three witnesses testified:  Dr. Marshall Bales, a court-appointed psychiatrist; Laurissa Schisel, Jane's behavioral health case manager at the Calumet County Department of Health and Human Services; and Jane.

¶3    Bales testified that he had examined Jane a month before the hearing; he was also generally familiar with her case, as he had met her on at least two other occasions.  According to Bales, Jane had diagnosed schizoaffective disorder, and at the time of examination, "she was clearly, very clearly in a manic, psychotic, and delusional mental state … it was very clear that she was in an exacerbation of her mental illness."  It was Bales' belief that despite Jane's

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version.

[2] For ease of reading, we refer to the subject individual by a pseudonym, not initials.

2

assertion to the contrary, she had not been taking her medication. Bales based this suspicion on a number of facts, including Jane's affect during the visit: when not on medication, Jane "gets manic. She gets psychotic. She gets dangerous.… She cannot think clearly. She has had all kinds of problems off medication numerous times all through the years." Bales also mentioned "a report that [Jane] had been noncompliant with medications." In addition, Jane had told her daughter that she was not taking her medication. Bales noted that Jane "said she did not need medication" and "said she hates medication. She said she embellished side effects of medication. She minimized benefits. And she will not take medication without a court order basically." It was Bales' further belief that Jane's medication noncompliance directly led to two recent hospitalizations, in May and September 2019. Bales explained that Jane was now "on observations to make sure she takes her medication" because "she may have been cheeking her medication."[3]

¶4     When asked to further explain why a court order was necessary, Bales stated:

> [Jane is] sick. She will not take medications if she can get out of it. She said things like, quote, "I love being off medications."
>
>     ….
>
> And throughout the interview she said things like, quote, "I see no benefit to any of these psych medications." What she did also is embellish side effects and minimize benefits, so she clearly will not take medications on her own free will ….

---

[3] "Cheeking" is a colloquial term for hiding medication in the mouth to avoid swallowing it.

Bales testified that he had explained the advantages and disadvantages of, and alternatives to, medication and that Jane did not appear to understand them.

¶5    Schisel, Jane's behavioral health case manager, testified that Bales' testimony was "consistent" with what she had observed during her two and one-half years working with Jane. Schisel explained that Jane's two hospitalizations were, in fact, caused by medication noncompliance, as Bales suspected. Apparently, Jane had managed to avoid taking some of her medication, even though she was on "med monitoring."[4]   Jane's recent noncompliance stemmed from a belief that her medication was changed without her approval; therefore, she did not believe she needed to take it. Schisel noted a stark difference in Jane's behavior on and off medication:  when "mentally stable on her medications, she engages appropriately," "involves herself in community outings," and "watches her grandchildren." At those times, Jane could make coherent conversation, without interrupting or talking loudly. When not on medication, on the other hand, Jane became "delusional," "agitated," and "angry." Schisel testified that she had "observed this repeated behavior on meds, off meds for the past two years."

¶6    Jane also testified. She did not directly admit that she purposefully stopped taking her medication—instead, she stated that she "mixed them up and goofed them up." In Jane's view, there was an unexplained change in her medication, and despite repeatedly asking "the County" about it, "they never give me a clear answer." Jane agreed, however, that she "didn't want to take the pill

---

[4] A private agency contracted with the County to ensure that Jane took her medication on nights and weekends. Schisel did not explain why Jane was able to circumvent medication monitoring, other than to state that the agency was not "doing their job." It appears that the problem with the agency was resolved by the time of the hearing.

that [she] didn't believe was prescribed," thus implicitly conceding that she did not take some of her medication.

¶7 The circuit court accepted the truth of the testimony before it, including Jane's past noncompliance with medication, her exaggeration of the side effects of medication, and her seeing "no benefit" to medication. The circuit court also noted that it appeared "quite clear" to Bales that Jane did not understand "the benefits and disadvantages of taking those medications." Thus, the court concluded, "due to her mental illness, [Jane] is substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives to her condition and is unable to make an informed choice as to whether to accept or refuse psychotropic medications." The court entered an order for involuntary medication and treatment to accompany the one-year order extending Jane's recommitment. Jane now appeals.

## DISCUSSION

¶8 A court may order involuntary commitment or recommitment upon finding, by clear and convincing evidence, that the individual has a mental illness, is a proper subject for treatment, and is dangerous under one of five statutory standards. WIS. STAT. § 51.20(1)(a), (1)(am), (10)(c), (13)(e). These required findings were made in this case and have not been challenged on appeal. Rather, this case involves the involuntary medication order that accompanied the recommitment order. Medication orders require a separate analysis as to whether the individual is incompetent to make a choice to refuse necessary medication.[5]

---

[5] Such finding is not required for those committed pursuant to the fifth "dangerousness" standard, WIS. STAT. § 51.20(1)(a)2.e., but that was not the applicable standard here. *See* WIS. STAT. § 51.61(1)(g)3.

WIS. STAT. § 51.61(1)(g)3.; *Outagamie County v. Melanie L.*, 2013 WI 67, ¶37, 349 Wis. 2d 148, 833 N.W.2d 607. As relevant to that determination, the statute provides as follows:

> [A]n individual is not competent to refuse medication … if, because of mental illness … and after the advantages and disadvantages of and alternatives to accepting the particular medication … have been explained to the individual, one of the following is true:
>
> a. The individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication … and the alternatives.
>
> b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness … in order to make an informed choice as to whether to accept or refuse medication….

Sec. 51.61(1)(g)4.; *see also* **Melanie L.**, 349 Wis. 2d 148, ¶¶53-55.

¶9 In keeping with the statutory language, our supreme court has reiterated that "[t]here are thus two ways under WIS. STAT. § 51.61(1)(g)4. that a person who is mentally ill and who has received the requisite explanation of the advantages and disadvantages of and alternatives to medication may be found incompetent to refuse such medication." *Melanie L.*, 349 Wis. 2d 148, ¶54. One way is to prove, by clear and convincing evidence, that the individual is incapable of *expressing* an understanding of the advantages and disadvantages of accepting the prescribed medication (and the alternatives). *Id.* Inasmuch as this standard requires proof that the individual does not even possess a general understanding of the medication, our supreme court has recognized that this can often be "a difficult standard for a county to meet." *Id.* That led the legislature to craft the second and "somewhat relaxed standard" in § 51.61(1)(g)4.b. set forth above—namely, that the county prove, again by clear and convincing evidence, that the individual is

6

substantially incapable of *applying* the understanding that is the subject of the first standard to his or her particular situation. *Melanie L.*, 349 Wis. 2d 148, ¶¶54-55.

¶10    Thus, both standards require the individual to *possess* a general understanding of the advantages and disadvantages of, and alternatives to, the prescribed medication; WIS. STAT. § 51.61(1)(g)4.a. further requires that the individual be able to *articulate* that understanding, whereas § 51.61(1)(g)4.b. requires that the individual be able to *apply* that understanding to his or her situation.  By way of example, a county would likely be unable to meet its burden under the first standard if the committed individual expresses some understanding as to what the prescribed medication could offer generally.  On the other hand, a county might meet its burden with respect to that same individual under the second standard if that individual, despite understanding the general attributes of the medication, were incapable of rationally assessing its impact on him or her personally.  In reviewing findings under either standard, we will uphold the circuit court's factual findings unless clearly erroneous, and we will accept all reasonable inferences from those facts.  *Melanie L.*, 349 Wis. 2d 148, ¶38.  Whether those facts satisfy the statutory requirement for involuntary medication is a question of law that we review de novo.  *Id.*, ¶39.

¶11    We resolve this case under the second standard, concerning Jane's ability to apply her general understanding to her particular situation, and conclude that there was clear and convincing evidence that Jane was incompetent to refuse

medication.[6]    First, with respect to the "understanding" component of this standard, Bales did not merely parrot the statutory language when he testified that Jane was unable to understand the advantages and disadvantages of, and alternatives to, medication.  *Cf.* **Winnebago County v. S.H.**, 2020 WI App 46, ¶17, 393 Wis. 2d 511, 947 N.W.2d 761.  Rather, his testimony and other evidence amply support this conclusion.  For example, at one point, Jane came to believe that her medications were switched without her knowledge; this was one of her stated reasons for stopping her medications.  There was no evidence, however, of this switch, and thus Jane's belief otherwise is likely the type of delusional or disordered thinking that may indicate a lack of basic understanding about the medication.  *See* **Melanie L.**, 349 Wis. 2d 148, ¶50 ("[I]n determining whether the evidence shows a person understands the advantages, disadvantages, and alternatives to a particular medication … a circuit court should 'take into account' … 'whether the patient holds any patently false beliefs about the recommended medication or treatment which would prevent an understanding of legitimate risks and benefits.'" (citation omitted)).  Even if there were a problem with Jane's medication on one occasion, this does not explain Jane's "repeated" attempts over the years to go off medication.[7]  A history of medication noncompliance without a

---

[6] We recognize that the appealed-from commitment order and accompanying medication order expired in October 2020.  Neither Jane nor the County advance any argument as to why, in such circumstance, Jane's appeal is (or is nonetheless not) moot, or why any exceptions to the mootness doctrine should (or should not) apply.  *See* **Marathon County v. D.K.**, 2020 WI 8, ¶19, 390 Wis. 2d 50, 937 N.W.2d 901.  We do view this issue, however, as one that is "likely of repetition and [yet] evad[ing] review," and for which our discussion may be of practical help to future litigants.  *See id.*  With that consideration in mind, and given the absence of any argument to the contrary, we will reach the merits of Jane's appeal.

[7] Schisel testified that as of the November 2019 hearing, Jane "has not had any medication changes in the last six months."  Nonetheless, it is possible (albeit unlikely) that there may have been some error with Jane's medication; for example, she may have received the wrong medication from her pharmacy.  We need not decide this point for the purpose of Jane's appeal.

8

reasonable explanation supports finding a lack of understanding as to its advantages, disadvantages, and alternatives.  *See id.*, ¶75.

¶12     Second, even if Jane were capable of *understanding* the effects of medication, the evidence was fairly overwhelming that she could not *apply* that understanding to her situation.  Bales did not limit discussion to Jane's understanding in the abstract, but linked it back to Jane's own condition:  she downplayed, to the point of denying, any benefits of the medication to her illness and she exaggerated the side effects, as justifications for her refusal to take medication.  In short, in refusing her medication, Jane was not making anything that could be described as an "informed choice."  *See* WIS. STAT. § 51.61(1)(g)4.b.; *Melanie L.*, 349 Wis. 2d 148, ¶76 ("'Informed choice' means a choice based on an informed understanding of the viable options with respect to medication or treatment.").

¶13     Jane nonetheless argues that evidence supporting the requisite "application" standard was lacking because Bales merely testified that Jane did not *possess* this understanding (rather than be capable of *applying* it), but this amounts to the same thing.  If Jane could not comprehend the advantages and disadvantages the medication offered to her, and the alternatives that were available to her, she could not apply that knowledge to her own mental illness.  In other words, as discussed above, Bales may not have uttered the magic statutory words, but he did in fact discuss Jane's inability to apply her understanding, testifying that Jane minimized or denied the benefits of medication and exaggerated its side effects.  Further, Bales was not the only witness supporting this point:  Schisel testified that Jane functioned normally only when taking medication, a point Jane seemed unable to appreciate in her own testimony.  Additional evidence thus supports Bales' testimony and the circuit court's ultimate conclusion.  We find that Jane

met the statutory standard: "because of [her] mental illness," she was "substantially incapable" of applying her understanding (if any) of her medication's advantages, disadvantages, and alternatives to her own condition. *See* WIS. STAT. § 51.61(1)(g)4.b. We affirm.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b) 4.